The next case on the calendar is Blanton v. Education Affiliates, Inc., et al. Thank you. Thank you so much. Good morning, Your Honors. Mr. Rockford, whenever you're ready. I see you reserve three minutes for rebuttal. Thank you, Judge Bianco. Good morning, Your Honors. Mitch Rockford on behalf of Appellant St. Thelowin Blanton. Your Honors, the record on this appeal does not support summary judgment in favor of defendants. And there are three principal areas, or fact areas, in which we can explore that, where every material fact is in genuine dispute. And the reasonable inferences on this record all favor Wynne Blanton precluding summary judgment. Those three areas are his inducement to leave Fortis College, where he was working very well, getting a nice little salary. Two, his performance during the two some odd years that he was the campus president for EAI on Staten Island. And three, the facts surrounding his termination, which occurs between, I'm going to peg that between October of 2015 and, of course, the meeting in April, mid-April of 2016. The inducement is a lie. Duncan Anderson tells Eric Jacobs to send Wynne Blanton an offer letter that essentially says, if you are able to achieve fully approved status for the Staten Island campus by June 1, 2015, you will get $100,000. Within months, Mr. Blanton realizes that this is a lie. He frames this to Mr. Jacobs, who concedes that, that this was Duncan Anderson's idea and it's a lie that they put into his offer letter. The one thing that I'm confused about is why is it not more of an indicia of bad negotiating or failure to do poor research? This is a sophisticated player who knows the business. He knows how hard it is to up test scores. He knows what goes into accreditation. So did he not just make a bad bargain? No, it's because he doesn't know what's behind the screen that Duncan Anderson and Eric Jacobs is fully aware of. What did they misrepresent to him? They misrepresented a, I frame it as promissory fraud, but within the promissory fraud is the fact that achieving a fully approved status. But there has to be a misrepresentation of fact that that was achievable. I mean, what was it that they told him that wasn't true about the school's scores and or the nature of the school? He was a college president. He headed up a school, where is it, Ohio or someplace? In Ohio. And he'd actually previously headed up a school in New York. Correct. So he was not, like Judge Perez asked, he was not new to this. He was not new to that process. So wouldn't you think that if someone says, we're going to give you 100 grand if in three years you get the test scores up to X level, 70%, so that the state's no longer monitoring what we're doing, okay? This is a for-profit institution, right? Yes, it is. Okay, all right. And so it says to him, you've got to get up to 100%. Don't you think somebody who has led these schools before would want to know, geez, what was the pass rate before? What is the curriculum? What do I need to do? What do I need to accomplish to do this? I think that what is not revealed to Mr. Blanton as part of his coming from the Fortis School and into the Staten Island campus- But what does Blanton do? Blanton says he's going to achieve it. Blanton- He doesn't say you lied to me. He says, at the time, ultimately just before he's released, he says the scores in the spring of, what is it, 2015? 2015. They're going to be 70%. 2016, Your Honor. 2016. Because now I've had three years. We've changed the curricula. These students, both the LPNs and the RNs, are going to have the opportunity to pass the test. And he's wrong. Mr. Blanton never makes a promise to achieve a result. He makes a promise to put processes in place that will lead to that result. And, indeed, he turns out to be correct. All right, I get that. He turns out to be- That's prescient. So he's still believing that- He says, geez, you lied to me. You lied to me about what these students were doing or what the test scores of these students were when they came in. You haven't presented one fact that's misrepresented. You just said this just wasn't achievable. They don't tell him that there is a common proposal to the New York State Department of Education or application for both the Queens and Staten Island campuses to be basically accredited for fully approved together. That's never revealed to him. And that's not knowable. But I go back to who other than him would be in a better position to ask questions like that. He is not someone from another field. He is a sophisticated actor that knows how this works, and he knows how accreditation works. Judge Perez, I think that gets to Mr. Blanton's testimony with respect to his reliance on Mr. Jacobs. Mr. Jacobs and Mr. Blanton had been working together for several years while Mr. Blanton was at Fortis, and he relies on it, and he testifies to that. So he has inherent faith in Mr. Jacobs' capacity to- But, again, isn't that a bad bargain on his part? I also don't understand why he could not or what is the difference between what you're asking us to find and him saying, you know what, I'm not going to take this offer. What you need to do is tell me that I need a $200,000 bonus because what you're asking me to do is next to impossible. Or, you know what, I want a $100,000 bonus, but I only want to have to increase my test scores by 25%. What made him unable to put himself in a better position? It's not like he didn't have any control in all of this. I think the context for the lie is that this is part of a series of misrepresentations that are made to Mr. Blanton over the course of his career while he's at Staten Island. So while it may be true that- Wait a second, wait a second. Once he's at Staten Island, your theory on promissory estoppel is that he goes to Staten Island because there's a misrepresentation of a material fact upon which a reasonable person would rely. Those are the elements of promissory estoppel, right? Correct. Yes. Yes, Judge. Any misrepresentation after he's there has nothing to do with your theory that he was enticed to come. No, and you're right, Your Honor, and that's why I framed it as three different periods of time where there's genuine issues of material fact with respect to Mr. Blanton's career while he's at Staten Island. Is there any material fact that is disputed with respect to whether or not somebody misinformed him about something? Is there a misrepresentation where he is saying you told me X and someone else is saying you told me Y? I think there's no genuine issues of material fact on that. Mr. Blanton testified that he was misled and Mr. Jacobs agreed that he was misled. That's the testimony in this case. What's the lie? What was the lie that he was told? What was the lie? Tell me the lie that he was told to get him to, induced him to take it. What was the lie? That it was illusory. That both Anderson, Duncan Anderson, who is the head, the CEO of this for-profit. Why was it illusory? Even if it involved both schools, it wasn't impossible? It was essentially. Why was it essentially impossible? I'll, Your Honor. In 30 seconds, tell me why it was essentially impossible. It's essentially impossible because NYSED is a titanic. It doesn't, the wrong analogy. It's an ocean liner. It doesn't turn on a dime. Okay, but that's not impossible. That just means, you know, you could hire a coach to say if X team wins the World Series, you know, and they could have the worst team in the league and it may never happen. But all of them know, but all of them do know that NYSED doesn't turn on a dime. And NYSED's record here is very clear that this campus is not going to achieve fully accredited status over a long period of time. He could have asked whatever questions he wanted to get more information on whether it was turn around on a dime or not. He could have asked whatever, let me see the stats now to see what I could do to achieve this bonus. And just to put a point on, that's just one of our claims. Thank you, Your Honor. Thanks.  Good morning, Your Honor, and may it please the court. Throughout the briefing, the summary judgment briefing before the district court, the briefing before the Second Circuit, and now the audience today, appellant's counsel has tried to make things appear to be more complicated than they really are. And what I can only perceive as being an effort to try to obfuscate the issues. As far as what Mr. Robert was just discussing, as Your Honor's rightly pointed out, with regard to the $100,000 bonus offer, Mr. Blanton testified that he asked nothing about the status of the school in the application process before signing the offer letter. Mr. Blanton testified that the first time he saw or heard anything about the offer letter, about the $100,000 bonus, was when he received the offer letter. And he never discussed anything about it afterwards before he signed it. Mr. Blanton, as you also correctly noted, had previously worked as a campus president in New York. He actually previously worked as a campus president for two New York schools, one of which he testified he was directly, he dealt frequently directly with NYSED about the school's accreditation. And the fact that he, and as he put in the declaration that he submitted in opposition to our summary judgment motion, he stated that it took the prior school three years to turn things around, and he knew that NYSED moved at a glacial speed, for lack of a better term. On a good day. On a good day, fair enough. And the fact that he didn't ask anything, or the fact that he didn't ask anything, it kind of precludes him from showing that someone in his position was justifiably relied on any misrepresentation. Second of all, as Your Honor has correctly pointed out, Mr. Blanton still has failed to point to what the misrepresentation is. There's nothing saying that E.A. would not have, that Duncan Anderson would not have very happily cut him a $100,000 check if St. Paul's SI got fully approved status by June 2015. Can you help me with a hypothetical if you don't mind? So let's just presume for a second that we adopt a theory that a claim for fraud would lie if E.A. knew that when they offered him the $100,000 bonus that there was no way that by 2015 they would achieve permanent status. Does that raise a triable question of fact for us? No. Okay, tell me why. Because for one, there's still no misstatement. There's no misstatement being given. I'm spinning out a hypothetical. So if we assume that they knew that by 2015 he wasn't going to be able to do it, and they offered him anyway, do we have a triable question of fact here? No, because he's still, even if we go there, which I don't think we should, but even if there's still not the reasonable reliance because he failed to ask anything. He asked nothing. He was in the best position to know about this. But you could have a hypothetical, for example, where you say we're going to give you a bonus in year three of $100,000, and they know the school's closing in two years, okay? The school's closing in two years. They've already made a decision to close the school, and you will tell him in year three he's going to get a $100,000 bonus. There, you would have a fraudulent inducement claim. You've been fraudulently induced, potentially, to sign the contract where they know factually it's impossible, right? Or am I missing something on that? Well, I think that's similar to what- Yeah, I'm just trying to give you a hypothetical where I think it would raise a triable issue of fact as to a fraudulent inducement claim with regard to a bonus. I still don't think it would, though, if Mr. Blanton didn't ask any questions about it. If he doesn't ask, are you going to close the school in year three? Fair enough. But this is what I would say. The difference between the two hypotheticals is that he wasn't in a position that he should have known to ask questions about are you closing the school. He was in a position- What if in the hypothetical the situation was that the recertification from the department would occur in three years, but the employer knew that it was based on the performance of two schools, only one of which Blanton would represent, and they knew that the other school- and they didn't let him know that it was based on the performance of two schools. So Blanton didn't know that regardless of his performance, the performance of the other school would be critical to his eligibility to get $100,000. I still think he needs to do some semblance of digging. What about the second school? Fair enough. Fair enough. So that's closer to possible being a claim? I suppose that would be the case. With that said, I still think there still has to be a material misrepresentation, which is not the case here. Mr. Roper only really covered that one claim. Oh, one other piece that Mr. Roper did mention was that the relationship between Mr. Jacobs and Mr. Blanton, having worked together for a number of years, was sufficient so that Mr. Blanton should have just kind of willy-nilly gone along with whatever Mr. Jacobs said. I dispute that as well. Mr. Blanton testified specifically that he understood that Mr. Jacobs was representing education affiliates in the negotiations. On the ADA claim, your argument is that the passage rate was the key to everything, and that they gave him three years to get it up to the level where they could get the permanent authority, and he had a 59% passage rate after three years. Is that essentially correct? 47% passage rate. I thought in the first quarter of 2016 it was 47%? 47%. I had it back to the 59% in the first quarter. I'm sorry. I apologize. That's okay. With regard to the disability claim, the Kelly and Associates documents were all produced after. I see the reference that you made to a number of different points in the appendix. They were all produced after the filing of the claim, correct? So there's two documents that I think you're referring to. There's the large spreadsheet. Correct. And then there's a three-page letter that has a list of high claimants. The high claimants. The high claimants. So, yes, that was a document that was. The one that Ms. Hosey testified about? Yes. It said it was only prepared at her request, and she began gathering information and responded to the EEOC charge? Correct, Your Honor. Okay, fair enough. Thank you. Your argument tends to focus on what Anderson knew or didn't know, and are you in a worse position if we decide to impute Jacob's motives to Anderson? Why shouldn't we do that? Well, Mr. Anderson was the decision-maker, so that's why I wouldn't promote, I wouldn't place, I wouldn't put Mr. Jacob's motives on Mr. Anderson. But Mr. Jacob's wouldn't even have, it's not Mr. Jacob's. He works for EA, but he's not the owner of EA, so he would have no motive. It doesn't make a difference to him whether Mr. Blanton's wife is incurring expenses for EA's medical plan. So your argument is that he didn't tell anybody but Jacob's, and we cannot impute what Jacob's knew or didn't know to Anderson. Is that what your argument is? So there are a few pieces to it. So all Jacob's knew was that Mr. Blanton's wife had attempted to commit suicide and was hospitalized. I don't think that that's even by itself enough for knowledge of a disability, but for a cost, and once again, Mr. Anderson, there's no evidence that Mr. Anderson knew about that, and he couldn't submit a sworn statement that he didn't, But for this cost theory type of claim, the case law, and there's nothing in the Second Circuit that I was able to find, but the case law is that the decision maker has to be aware of the costs that the purportedly disabled person is causing for the school or for the employer when making that decision. That's how you show causation, and that's just not the case here. All right. Thank you, Mr. Berker and Mr. Rockford. Thank you, Your Honors. Thank you, Your Honors. I'll never get used to it. Judge Wesley, there is record reference to not just Penny Hosey accumulating data for purposes of responding to the EEOC. That does happen after the claim is made to the EEOC, the charge is made to the EEOC. But Teitelbaum, who is the head of HR, testified that he routinely received these kind of high-cost materials, high-cost claim materials, and we produced one of those. It's in the record at A1011, which is the high claims report. They redacted everybody else, but they show Mr. Blanton and his wife as being one of the high-cost items for purposes of costing out the health care, which is unique, as the record is clear, to EAI. It's paying its own insurance during these years. In addition, Duncan Anderson is on a high horse during this time trying to ensure that everyone is getting off the most expensive plan because it's the most expensive for EAI. He's acutely aware, and the reasonable inferences from the record show, he's acutely aware of what the costs are and that he is quite upset with Mr. Blanton having chosen, continuing to choose this. You have to prove that's the but-for cause of their decision, their termination, and it's not like they suddenly raised the passage rate issue after his wife was hospitalized. They've been talking about that passage rate from day one. The but-for causation under Justice Gorsuch's elocution of it in Bostock versus Clayton County, which I recognize is a dismissal-type case under Title VII, but it's the same standard, establishes that but-for is essentially a fact-finding mission because it requires you to remove a cause, and if that cause changes the outcome, then, according to Justice Gorsuch, it is a but-for. But we certainly can't assume from that that if anybody alleges a claim that has a but-for causation that they're entitled to a jury, right? That's right. That's exactly what James and Distor teach us. This court's in James versus New York Racing. Okay, so your argument is that if anybody ever raises a claim that has but-for causation, they survive summary judgment because they have to go, okay. No. More than that has to happen, Your Honor. More than that has to happen, and more than that has happened on this record. It is under James versus New York Racing, it is the totality of the record. It's insufficient merely to point out that the defendants are lying about their version of what happened and therefore argue, well, that's the but-for. The totality of the record must demonstrate that there are genuine issues of material fact as to either the supporting data for the defendant's position, the employer's position, or that the defendant's position as here, because it's riddled with error and riddled with inconsistency, is unworthy of credence. And that's the holding of Distor, and that is the holding that we submit to the court. All right. This case should be remanded for trial. Thank you, Your Honor. Thank you, Mr. Roth. Thank you, Mr. Berger. We'll reserve the decision. The last case on the calendar is on submission, SJ versus New York City Department of Education. And that completes the business of the court. And we're thanks to our courtroom deputy. I ask the court be adjourned. Good day, gentlemen. The court stands adjourned. Thank you all.